221 F.2d 524
 95 U.S.App.D.C. 244
 RED STAR MANUFACTURING CO., Inc., Manati Pearl Works, Inc.,
Petitioners,
v.
F. Granville GRIMES, Jr., Acting Administrator, Wage and
Hour Division, United States Department of Labor,
Respondent.
 No. 11949.
 United States Court of Appeals, District of Columbia Circuit.
 Argued Oct. 18, 1954.
Decided Dec. 23, 1954.
 
 [95 U.S.App.D.C. 245] Mr. Erwin Feldman, New York City, for petitioners.
 Miss Bessie Margolin, Chief of Appellate Litigation, Washington, D.C., with whom Messrs. Stuart Rothman, Solicitor, and Joseph M. Stone, Attorney, Washington, D.C., all of the United States Department of Labor, were on the brief, for respondent.
 Before PRETTYMAN, BAZELON and WASHINGTON, Circuit Judges.
 BAZELON, Circuit Judge.
 
 
 1
 This is a petition to review an order of the Acting Administrator of the Wage and Hour Division of the Department of Labor under the Fair Labor Standards Act of 1938, as amended.[1] The order raised the minimum wage for the Puerto Rican pearl button and buckle industry from 46 to 54 cents an hour. Petitioners, Red Star Manufacturing Co., Inc., and Manati Pearl Works, Inc., are prominent manufacturers of ocean pearl buttons in Puerto Rico,[2] and are persons 'aggrieved' within the meaning of the judicial review provisions of the Act.[3]
 
 
 2
 By a 1949 amendment to § 6(a) of the Act, Congress established a 75 cent minimum hourly wage.[4] Under § 6(c), as amended, that minimum is inapplicable in Puerto Rico and the Virgin Islands where pre-existing minimum wages were to remain in force until superseded by wage orders issued by the Administrator pursuant to the recommendations of a special industry committee.[5] The mechanics for appointing such an industry committee are set out in § 5(a) which provides that such committees shall be subject to the provisions of § 8.[6] Section 8(a) declares:
 
 
 3
 'The policy of this Act with respect to industries in Puerto Rico [95 U.S.App.D.C. 246] and the Virgin Islands engaged in commerce or in the production of goods for commerce is to reach as rapidly as is economically feasible without substantially curtailing employment the objective of the minimum wage (of 75 cents an hour).'[7]
 
 
 4
 Section 8(b) directs industry committees to recommend to the Administrator
 
 
 5
 '* * * the highest minimum wage rates for the industry which it determines, having due regard to economic and competitive conditions, will not substantially curtail employment in the industry, and will not give any industry in Puerto Rico * * * a competitive advantage over any industry in the United States outside of Puerto Rico * * *.'[8]
 
 
 6
 Section 10(a), which provides for judicial review, declares that 'findings of fact by the Administrator when supported by substantial evidence shall be conclusive.'[9]
 
 
 7
 In May 1952 the Administrator of the Wage and Hour Division appointed Industry Committee No. 12 for the Button, Buckle and Jewelry Industry in Puerto Rico.[10] As authorized by § 8(b), public hearings were held in Puerto Rico in June 1952, at which time witnesses were heard and pertinent exhibits, including a comprehensive economic study prepared by the Wage and Hour Division,[11] were submitted. On July 1, 1952, the Committee voted unanimously to recommend a 54 cent minimum wage,[12] and in August its formal report was filed with the Administrator. Thereafter in October 1952, in accordance with § 8(d), a hearing was held before a Department of Labor Hearing Examiner in Washington, D.C.[13] Witnesses, including representatives of the petitioners, presented objections to the 54 cent rate, and the Economic Report prepared by the Wage and Hour Division was resubmitted together with supplemental data brining it up to date. The Administrator's findings and opinion approving the 54 cent rate were issued in April 1953.
 
 
 8
 Two principal grounds are advanced for setting aside the order: I. The Administrator's finding that the proposed increase would not 'substantially curtail employment' is not supported by substantial evidence; and II. No full and fair hearing was accorded because the identity of mainland firms whose wage costs were listed in the Economic Report was not disclosed.[14]
 
 I.
 
 9
 From the Administrator's findings and opinion, it appears that the conclusion that the proposed 8 cent an hour increase would not substantially curtail [95 U.S.App.D.C. 247] employment was predicated upon (1) a generally favorable evaluation of the Puerto Rican industry's current market position; and (2) an estimate that the proposed increase would effect an increase in total production costs of only about two per cent.
 
 
 10
 Petitioners contend that these subsidiary propositions are not supported by substantial evidence. Our consideration of this contention is governed by the following principles: '(we are not) to substitute our judgment of the weight of the evidence and the inferences to be drawn from it for that of the Administrator * * *';[15] the Administrator is required to consider 'over all' economic factors but is not required to make a specific finding on every 'conceivable relevant item';[16] and where the administrative process is 'fair and complete', we 'should hesitate long before nullifying the resultant * * *' order.[17]
 
 
 11
 (1) The generally favorable market position of the Puerto Rican firms. Petitioners argue that the evidence establishes sharply declining employment and profitability which have reduced the industry to such a 'low economic state' that it cannot sustain the proposed increase without substantial curtailment of employment.
 
 
 12
 Regarding employment, they urge that it is unrealistic to include the approximately 200 workers who were hired by Manati when it commenced its Puerto Rican operations in 1948 and that, accordingly, there has been a decline from a peak employment of more than 600 in 1936-37 to 'only some 200 employees' in 1952. But the Manati employment, while 'new,' is nonetheless employment, and the Administrator could properly so consider it. The resulting total for 1952 of 428, while less than the high of 600, is substantially greater than the low of 238 reported for 1945.[18]
 
 
 13
 Petitioners also assert that during the preceding year, 1951, two of the three firms were losing money and the third, Red Star, was earning a return on its $400,000 investment of only 2.5 per cent. But (1) 1951 was Red Star's poorest year of a four-year period during which its average net income after taxes was about $46,000, for a return of approximately 12.5 per cent on its investment;[19] and (2) Manati, established in 1948, had, according to its own spokesman, 'anticipated a loss to start with.'[20] Moreover, the Administrator did not disregard the recent 'downward trend' in 'the profitability of the firms in Puerto Rico * * *,' but found it to be a factor limiting the amount of the permissible increase.[21] By thus taking the profit data into account, he has complied with the statutory directive to consider 'economic and competitive conditions.'
 
 
 14
 Finally, in finding that the unimposing recent profit record did not entirely preclude an increase in the minimum wage, the Administrator relied, in part, [95 U.S.App.D.C. 248] on statistics regarding shipments of pearl buttons to the mainland. These figures, which are contained in the Economic Report, show that in recent years shipments from Puerto Rico have been stable in volume and greater in value than at any time in the past, and that from 1948 to 1952 the proportion of the mainland market supplied by Puerto Rican manufacturers had increased in both quantity and value.[22]
 
 
 15
 We find no error in the subsidiary finding that the Puerto Rican industry currently enjoys a generally favorable market position.
 
 
 16
 The estimated two per cent increase in total costs. The Administrator found that the 8 cent increase would cause an increase in total costs of only about 2 per cent. The underlying figures for this computation are contained in the Economic Report, and petitioners do not seriously contest their accuracy.[23] They do, however, challenge vigorously the premise accepted by the Administrator that an increase in the minimum wage would not appreciably affect wages already at or above the proposed minimum. It is petitioners' position that substantial wage increases will 'flow indirectly from the imposition of a higher minimum wage.'
 
 
 17
 At an Industry Committee hearing, the Secretary of Red Star explicitly stated that there 'wouldn't be any appreciable effect' on wages above the minimum. He qualified this statement to the extent that piecework rates, applicable to all pieceworkers, would have to be raised in order to preserve incentives. The witness estimated that a 10 cent increase in the minimum wage rate would mean a 10 to 25 per cent curtailment in employment, and hazarded, 'again * * * purely (as) a guess,' that a 5 cent increase would cause a 10 to 15 per cent reduction in employment. But the witness made no concrete showing that, in fact, productivity would suffer unless adjustments in the piecework rates were made; nor did he present evidence indicating that previous increases in the minimum wage had had this concomitant effect.
 
 
 18
 At the Administrator's hearing, petitioners presented more concrete evidence on this issue and sought to establish that the increase in the minimum would result in corresponding increases for all employees, straight-time as well as pieceworkers. A payroll analysis was introduced purporting to show that this effect followed the increase from 37 1/2 cents to 46 cents which became effective on August 21, 1950. These figures are meaningless and the Administrator could properly disregard them. (1) As of September 12, 1950, three weeks after the increase went into effect, the payroll had increased by an amount attributable only to raising wages formerly below 46 cents. (2) The 'indirect' effects are purportedly shown by increases reflected in the payroll for the week ended June 10, 1952, nearly two years later. (3) Those increases were the result of wage raises above the minimum which were set by union contracts negotiated during the intervening years.[24] (4) It clearly [95 U.S.App.D.C. 249] appears from the record that factors other than the higher minimum wage accounted for such above-minimum increases, most notably 'the extraordinary increase in the cost of living * * *' and the unusually profitable business conditions that prevailed after the increase went into effect.
 
 
 19
 We hold that the Administrator's finding that an 8 cent an hour increase in the minimum wage would not necessitate substantial curtailment of employment is supported by substantial evidence.
 
 II.
 
 20
 The Economic Report included, among other statistical data, a comparison of production costs of Puerto Rican firms with those of two unidentified mainland firms. At the Administrator's hearing, petitioners' request for disclosure of the names of these firms was denied, and petitioners now claim this limited their right of cross-examination and thus deprived them of a fair hearing. We do not agree.
 
 
 21
 These mainland cost data were relevant only to the determination of the Committee and the Administrator, pursuant to § 8(b), that the minimum wage proposed here does not give the Puerto Rican industry a competitive advantage over the industry on the mainland. Under our view of the statutory scheme, however, the validity of the proposed minimum does not rest upon this determination, but rests upon the determination, approved in our earlier discussion, that it 'is the highest minimum rate which can be established without substantially curtailing employment.' This determination executes the primary mandate of § 8(a), which declares that the policy of the Act with regard to industries in Puerto Rico is to reach the minimum wage of 75 cents an hour 'as rapidly as is economically feasible without substantially curtailing employment.' The proviso in § 8(b)-- that the minimum wage to be fixed under the Act for workers in Puerto Rico shall not be so low as to give a competitive advantage to Puerto Rican industry over mainland industry-- was introduced into the law in 1949 solely for the protection of mainland industry, and was not intended to confer rights upon industrial firms in Puerto Rico.[25] In the light of this purpose of the proviso, petitioners have no basis here for claiming that they are entitled to inspect confidential data gathered by the respondent in support of his findings that the minimum wages fixed by him are not so low as to create an undue competitive advantage over mainland industry. Such finding in no way aggrieves the petitioners. Limitation upon cross-examination with regard to the data at issue was not therefore 'of such a prejudicial character as to make the hearing unfair.'[26]
 
 
 22
 Furthermore, in Opp Cotton Mills v. Administrator, the Supreme Court declared the Administrator's wage order function to be legislative in character, similar to that exercised by the President, with the aid of the Tariff Commission, in raising or lowering tariff duties.[27] And in Norwegian Nitrogen Products Co. v. United States, the Court made clear that, in proceedings before the Tariff Commission, interested parties have no unrestricted right of access to even very relevant information in the Commission's files. To invalidate such a proceeding, the Court said, the nondisclosure 'must be shown to be arbitrary.'[28] Here we find no arbitrary action: as in the Norwegian Nitrogen case, the 'information was obtained on a confidential basis'; and, for the reasons already discussed, [95 U.S.App.D.C. 250] the information in question was not of substantial importance in this proceeding.
 
 
 23
 The order of the Administrator is affirmed.
 
 
 
 [1]
 Act of June 25, 1938, 52 Stat. 1060, as amended by Fair Labor Standards Amendments of 1949, 63 Stat. 910, 29 U.S.C.A. § 201 et seq
 
 
 [2]
 A third firm, Porto Rican American Button Company, Inc., was operating in the ocean pearl button filed at the time these proceedings were instituted. It did not participate actively in the administrative hearings and is not a party here, probably because it has since switched to the manufacture of plastic buttons
 
 
 [3]
 29 U.S.C.A. § 210(a)
 
 
 [4]
 63 Stat. 912, 29 U.S.C.A. § 206(a)
 
 
 [5]
 63 Stat. 912, 29 U.S.C.A. § 206(c)
 
 
 [6]
 29 U.S.C.A. § 205(a)
 
 
 [7]
 29 U.S.C.A. § 208(a). Emphasis supplied
 
 
 [8]
 29 U.S.C.A. § 208(b). Emphasis supplied
 
 
 [9]
 29 U.S.C.A. § 210(a)
 
 
 [10]
 The Committee, as required by the statute, consisted of representatives of the public, and of employers and employees in the industry. 29 U.S.C.A. § 205(b)
 
 
 [11]
 This study, entitled 'The Button, Buckle and Jewelry Industry in Puerto Rico,' will be referred to as the 'Economic Report.'
 
 
 [12]
 This rate applied only to the buckle and button division of the industry, the Committee having decided that jewelry should be treated as a separate division
 
 
 [13]
 Under § 8(d), 29 U.S.C.A. § 208(d), the Administrator must consider the same factors 'required to be considered by the industry committee,' and has authority only to approve the Committee's recommendations, or to disapprove and refer the matter back to the Committee for further consideration
 
 
 [14]
 A third contention advanced by petitioners is that the report of the Industry Committee was improperly submitted to the Administrator because two of the Committee members-- from among the full membership of nine who considered, approved and signed the report-- had resigned prior to the date of signing. Clearly their resignations do not affect the validity of the report since § 5(c) of the Act provides that 'two-thirds of the members * * * shall constitute a quorum,' and that only a 'majority of all its members' is required for a Committee decision. 29 U.S.C.A. § 205(c)
 
 
 [15]
 Opp Cotton Mills v. Administrator, 1941, 312 U.S. 126, 156, 61 S.Ct. 524, 538, 85 L.Ed. 624
 
 
 [16]
 Andree & Seedman, Inc., v. Administrator, 1941, 74 App.D.C. 240, 243, 122 F.2d 634, 637
 
 
 [17]
 Southern Garment Mfrs. Ass'n v. Fleming, 1941, 74 App.D.C. 228, 238, 122 F.2d 622, 632
 
 
 [18]
 Petitioners also contend that the employment total of 428 is misleadingly high because the industry was working a short week, but statistics submitted by petitioners fail to indicate any significant decline in total man-hours worked
 
 
 [19]
 This average is somewhat inflated due to the unusual earnings in 1950 of more than $99,000, after taxes. But earnings after taxes in 1948 and 1949 averaged approximately $18,650, for a respectable return of about 4.7 per cent on a $400,000 investment
 
 
 [20]
 In 1950 Manati earned over $45,000 after taxes, an amount sufficient to offset its losses for the other three years and leave a net profit after taxes of over $10,000 for the four years of its operations
 
 
 [21]
 Another factor having a limiting effect was the competition to which the industry was subject from plastic buttons and imports from Japan and the Philippine Republic
 
 
 [22]
 The figures show, inter alia, that while prior to 1950 the value of all shipments (finished and unfinished) had never reached $1,000,000, in that year the value of total shipments amounted to $1,700,000, and continued in excess of $1,600,000 in 1951 and 1952; and that from 1948 to 1951 the proportion of the mainland market supplied by Puerto Rican manufacturers increased quantitatively from 13 to 17.2 per cent and value-wise from 8.2 to 14.2 per cent
 
 
 [23]
 Table 28 of the Economic Report shows that an increase to 54 cents would directly affect 59.5 per cent of the workers and would result in a percentage increase in the wage bill of 6.8 per cent. Labor costs in the Puerto Rican industry were assumed throughout the proceeding to amount to approximately 29 per cent of total costs
 
 
 [24]
 'Q. Does that (union) contract give specific minima over the various operations? A. (Secretary of Red Star) It provides a blanket minimum of 46 cents an hour and it specifies hourly rates of certain specific operations, such as polisher, mechanics--
 'Q. Those on the hourly rate are specified in the contract? A. If there are any different rates than 46 cents they are specified in the contract.'
 
 
 [25]
 H.R.Rep. No. 5856, 81st Cong., 1st Sess., 63 Stat. 915 (1949); see Conference Rep. No. 1453, Oct. 17, 1949
 
 
 [26]
 Cia Mexicana de Gas v. Federal Power Commission, 5 Cir., 1948, 167 F.2d 804, 807
 
 
 [27]
 1941, 312 U.S. 126, 146, 61 S.Ct. 524, 85 L.Ed. 624
 
 
 [28]
 1933, 288 U.S. 294, 321, 53 S.Ct. 350, 360, 77 L.Ed. 796