448 F.2d 1161
 20 Wage & Hour Cas. (BN 105, 145 U.S.App.D.C. 238,
65 Lab.Cas. P 32,532
 Sindicato Puertorriqueno De Trabajadores, affiliated with
Amalgamated Meat Cutters and Butcher Workmen of
North America, Afl-Cio, et al., Petitioners,
v.
James D. HODGSON, Secretary of Labor, United States
Department of Labor, et al.
 No. 24057.
 United States Court of Appeals,
District of Columbia Circuit.
 Argued March 5, 1971.
Decided July 21, 1971.
 
 Mr. Laurence Gold, Washington, D. C., for petitioners. Mr. J. Albert Woll, Washington, D. C., was on the brief for petitioners.
 Miss Carin Ann Clauss, Atty., U. S. Department of Labor, of the bar of the Court of Appeals of New York, pro hac vice, by special leave of Court, with whom Miss Bessie Margolin, Associate Sol., and Mrs. Helen W. Judd, Atty., U. S. Department of Labor, were on the brief, for respondents.
 Before FAHY, Senior Circuit Judge, and LEVENTHAL and ROBB, Circuit Judges.
 FAHY, Senior Circuit Judge:
 
 
 1
 The case is before us on petition pursuant to Section 10(a) of the Fair Labor Standards Act, 29 U.S.C. Sec. 210(a), under which a "person aggrieved by an order of the Secretary [of Labor] issued under section 208 * * * may obtain a review of such order in the United States Court of Appeals." The order of the Secretary establishes a scale of minimum wage rates for several classifications of agricultural workers in Puerto Rico which are described in the order. Petitioners are Sindicato Puertorriqueno de Trabajadores, a labor organization representing agricultural employees in Puerto Rico,[1] and several employees in Puerto Rico's agricultural industry representing themselves and their class. Petitioners primarily seek modification of the Secretary's order by substituting for its minimum wage rates the rate of $1.30 per hour for all classifications, which is the minimum, under Section 206(a) (5), for agricultural employees in the continental United States. For reasons stated in this opinion we do not disturb the rates fixed, though we do remand the case to the Secretary for further proceedings should petitioners initiate a request to that end.
 
 
 2
 The statutory scheme under which the order was made is now outlined. Section 208(a) of the Act provides that the Secretary of Labor[2] "shall from time to time convene an industry committee or committees, appointed pursuant to section 205 * * * [to] recommend the minimum rate or rates of wages to be paid under section 206 * * * by employers in Puerto Rico" engaged in the production of goods for commerce. Under Section 205(b) the committee is to be composed of an equal number of disinterested members representing the public, employers in the industry, and employees in the industry. The committee must be convened at least once every two years until wage rates in Puerto Rico meet the minimum standards for the continental United States. (Section 208(a)). The committee is to investigate conditions in the industry, hear witnesses, and receive such evidence as may be necessary or appropriate to "enable the committee to perform its duties and functions." (Section 208 (b)).[3] The committee's duty under Section 208(b) is to
 
 
 3
 recommend to the [Secretary] the highest minimum wage rates for the industry which it determines, having due regard to economic and competitive conditions, will not substantially curtail employment in the industry, and will not give any industry in Puerto Rico or in the Virgin Islands a competitive advantage over any industry in the United States outside of Puerto Rico and the Virgin Islands.
 
 
 4
 The policy of the Act with respect to industries in Puerto Rico, set forth in Section 208(a), is "to reach as rapidly as is economically feasible without substantially curtailing employment the objective of the minimum wage prescribed in paragraph (1) of section 206(a) * * * in each such industry." The committee in performing its functions and duties is required to consider competitive conditions in the industry, wages for like or comparable work established by negotiated labor agreements, and minimum wage standards voluntarily maintained for like or comparable work. (Section 208(c)(1), (c)(2), (c)(3)). Finally, the committee is authorized to "recommend such reasonable classifications within any industry as it determines to be necessary for the purpose of fixing for each classification within such industry the highest minimum wage rate" not in excess of that prescribed by Section 206(a). (Section 208(c)).
 
 
 5
 After the committee has made its findings of fact and recommendations it is required to file with the Secretary its report, which the Secretary "shall publish * * * in the Federal Register and shall provide by order that the recommendations contained in such report shall take effect upon the expiration of 15 days after the date of such publication." (Section 208(d)). Any person aggrieved by the order is granted the right of review to which we have referred (Section 210(a)). The court "shall have exclusive jurisdiction to affirm, modify, or set aside [the] order in whole or in part, so far as it is applicable to the petitioner. The review by the court shall be limited to questions of law, and findings of fact by such industry committee when supported by substantial evidence shall be conclusive." (Section 210(a).)
 
 
 6
 Under the statutory plan thus outlined Industry Committee No. 89-A was appointed by the Secretary on November 1, 1969, to set minimum wage rates for agricultural employees in Puerto Rico.[4] The Committee held hearings, received and considered evidence, and filed its report on December 12, 1969, with findings of fact and recommendations. The recommendations of the Committee were reached by a 5 to 4 vote of its members, the Chairman and the three labor members dissenting. Upon publication of the report the Secretary provided by the order before us, as required by Section 208(d), that the recommendations of the report be put into effect. The petition for review followed.
 
 
 7
 Before turning to the merits we outline an unusual situation in the agricultural industry of Puerto Rico. By Act of the Puerto Rican legislature, Law No. 142, approved June 29, 1969, farm workers are guaranteed a minimum income of 80 cents per hour during fiscal year 1969-70, 90 cents per hour during fiscal year 1970-71, and $1.00 per hour during fiscal year 1971-72 and subsequent years. The purpose of the law, as stated by the legislature, is "to guarantee to the agricultural workers a greater income * * * [to] persuade them to continue working in agriculture in order to ease the shortage of manpower encountered by this industry, without raising the costs of production," with the hope also of "rais[ing] the standards of living of [the farm] workers so that they may enjoy a more rewarding existence." Since the rates before us except for two classifications of workers on dairy farms, are below the amounts provided by Law No. 142,[5] increases in the minimum wage rates under the Fair Labor Standards Act which do not reach the level of the income set by Law No. 142 are not assumed by the Commonwealth of Puerto Rico but by employers. The difference between the income generated by the rates fixed under the Fair Labor Standards Act and the income guaranteed by Law No. 142 is borne by the Commonwealth of Puerto Rico. Moreover, as the dissenting labor members of the present industry Committee point out, recommendations under the Fair Labor Standards Act can benefit farm workers only if the minimum rates fixed are above those set by Law No. 142.
 
 
 8
 * The minimum wage rates established by the present order are in eight classifications, ranging from a low of 58 cents per hour to a high of $1.10 per hour. The schedule of classifications and minimum rates are set forth in the margin.[6]
 
 
 9
 Petitioners contend primarily that the order is invalid because it fails to meet the standards set by Section 208(b) of the Act. They contend that since the policy of the Act under Section 208(a) with respect to the Puerto Rican agricultural industry is "to reach as rapidly as is economically feasible without substantially curtailing employment" the $1.30 per hour wage objective, and that since the Committee failed to follow the standards of Section 208(b) to achieve the prescribed policy, the court is empowered to and should modify the rates fixed in the order by increasing the minimum wage rate to $1.30 per hour for all classifications, the ultimate goal envisaged by Section 208(a) of the Act.
 
 
 10
 The essence of petitioners' argument is stated by them as follows:
 
 
 11
 [E]stablishment of a minimum wage less than that set in Secs. 6(a) and 6(b) must be based on a demonstration that no higher figure would be justified. As a matter of economic theory, as well as common sense, detailed statements of the economic situation of the covered employers as a group over a period of time, with special emphasis on gross income and expense figures are a necessary, though not sufficient, condition to such a demonstration.[1] For the "highest minimum wage * * * which will not substantially curtail employment" is the function of the covered employers' ability to pay and of the elasticity of their demand for labor. (Footnote omitted)
 
 
 12
 The starting point in determining this minimum figure, the argument continues, is to ascertain the employers' income and expense figures, which was not done. The failure to obtain such evidence it is argued is fatal to the order. Furthermore, the petitioners argue, the Secretary's regulations, 29 C.F.R. Secs. 511.11 and 511.13, support their position that findings related to such evidence are necessary.
 
 
 13
 Section 511.11 specifies that among the types of data which may be considered by an industry committee are "(d) financial conditions and trends since promulgation of the present wage order as reflected in profit and loss statements and balance sheets." The Secretary, we think acceptably, construes this regulation as falling short of requiring such data as a sine qua non to the validity of a recommendation and consequent order. So, too, as to Section 511.13. That section requires that "[t]estimony on behalf of an employer or group of employers as to inability to pay the minimum wage rate specified in section 6(a)(1) or section 6(b) * * *, or as to inability to adjust to a higher minimum wage rate than prescribed by any applicable wage order of the Secretary, shall be supported by tangible objective data filed as part of the prehearing statement under Sec. 511.8, including pertinent unabridged profit and loss statements and balance sheets for a representative period of years for the individual firm or firms involved." We think the Secretary's interpretation of this regulation, as imposing an obligation to come forward with "tangible objective data" only upon those companies which seek to establish by evidence before the Committee their inability to pay a higher wage rate without substantially curtailing employment, is reasonable. We accordingly do not read either regulation as necessarily imposing a burden on the covered industry to come forward with income and expense figures or profit and loss statements.[7] Under Section 205(d) of the Act the "industry committee may summon other witnesses or call upon the [Secretary] to furnish additional information to aid it in its deliberations." See note 3 supra. Moreover, the wages to be fixed, with classifications as may be established, are to be determined for the entire industry, not for a particular firm or firms considered separately. Finally, while ability to pay without substantially curtailing employment is critical to a valid minimum wage rate determination, the record in this case indicates that with respect to at least a large part of the agricultural industry in Puerto Rico it might not be possible to obtain the data petitioners contend are essential. Thus a representative from the Puerto Rico Farm Bureau explained the dearth of profit and loss statements and balance sheets as due to the fact that most farmers simply do not have this type of information and that about two-thirds of the farmers have attended school for less than six years.
 
 
 14
 In situations such as the above we hold that the Committee is not precluded from making recommendations on the basis of evidence which is available. We do not find support in the statute for the position of petitioners that the congressional plan imposes in all cases upon the farmers a special burden of proof with respect to the basis for the Committee's recommendations.[8] The Committee, nevertheless, must make findings and recommendations which can in good reason be sustained by the evidence. See Part II infra.
 
 
 15
 The absence of a demonstration in the record, therefore, that the employers supplied detailed statements of their economic condition, establishing by the particular data an inability to pay higher minimum wage rates, is not fatal to the validity of the order. Furthermore, even if it were, the court would not have authority for that reason to modify the rates upward as petitioners urge. The Committee is to make the determinations which are put into effect by the Secretary. Were the court to exercise this function upon the basis of the record before us the policy and objective of the Act upon which petitioners themselves rely might well be defeated by a substantial curtailment of employment in the industry. Cf. Addison et al. v. Holly Hill Fruit Products, Inc., 322 U.S. 607, 618-619, 64 S.Ct. 1215, 88 L.Ed. 1488 (1944).
 
 II
 
 16
 In their petition to the court petitioners also attack in general terms the legality of the order, saying that it "does not meet the standards set by Sec. 8(a) of the Act"; and in their reply brief they refer, though rather casually, to the failure of the Committee even to attempt to develop a theory which would explain how its conclusions follow from the evidence before it. We think there is substance to this position.
 
 
 17
 The Findings of Fact of the Committee are devoid of a single subsidiary finding to support the Committee's conclusion that "having due regard to economic and competitive conditions, the minimum wage rates set forth in the recommendations * * * are the highest minimum wage rates for the industry, which will not substantially curtail employment in the industry and will not give any industry in Puerto Rico a competitive advantage over any industry in the United States outside of Puerto Rico, the Virgin Islands and American Samoa." The Findings of Fact preceding this conclusional finding are devoted solely to the following: (1) A definition of the general agricultural industry in Puerto Rico; (2) a statement of minimum wage rates for the industry, by classifications, in effect at the time under the Act; (3) the establishment of new classifications, described in substantial detail; (4) a statement of the amount of acreage devoted to agriculture in Puerto Rico, with comments upon the relative economic importance of certain crops; (5) a discussion of the place of livestock products, milk, egg production, coffee, tobacco, and pineapple in the economy; (6) a statement that the output of most other field crops has shown a general tendency to decline or remain stable; (7) a statement, along with some statistics, that since World War II the nonagricultural sectors of the Puerto Rican labor force have grown while the agricultural sector has declined; (8) a table prepared in May 1969, by the Wage and Hour and Public Contracts Divisions, of the number of farms, number of covered employees, and average straight-time hourly earnings of the employees in six classifications; and (9) a statement that the Commonwealth of Puerto Rico, by its Law No. 142, has provided a guaranteed income supplement benefit to all workers employed in its agricultural industry earning less than a specified amount. None of these findings, which in the report are designated Findings of Fact, has any direct bearing on the ultimate finding of minimum wage rates for the several classifications set by the Committee.
 
 
 18
 A legal question thus arises as to the validity of the order. A court reviewing an order under such provisions as those contained in the Fair Labor Standards Act, which we have outlined, must have before it findings which are sufficiently definite to enable it to review intelligently the decision of the agency and ascertain if the facts on which it acted afford a reasonable basis for its decision. See Retail Store Employees Union, Local 400 v. NLRB, 123 U.S.App.D.C. 360, 362, 360 F.2d 494, 496 (1965); Saginaw Broadcasting Co. v. FCC, 68 App.D.C. 282, 287-289, 96 F.2d 554, 559-561, cert. denied, Gross v. Saginaw Broadcasting Co., 305 U.S. 613, 59 S.Ct. 72, 83 L.Ed. 391 (1938). The court in Saginaw Broadcasting said that "a reviewing court cannot properly exercise its function upon findings of ultimate fact alone, but must require also findings of the basic facts which represent the determination of the administrative body as to the meaning of the evidence, and from which the ultimate facts flow." 68 App.D.C. at 289, 96 F.2d at 561. In passing upon an order of the Civil Aeronautics Board, we again stated the matter as follows:
 
 
 19
 We are asked to accept this judgment of the Board, but the basis on which it was reached consists of the conclusionary statements set forth above. These are not the sort of findings which enable us intelligently to pass upon the correctness of the judgment reached.
 
 
 20
 Braniff Airways, Inc. v. CAB, 113 U.S.App.D.C. 132, 135, 306 F.2d 739, 742 (1962), and see cases cited therein.
 
 
 21
 The fixing of wage rates has not been done directly by Congress. Accordingly, the method adopted by Congress is not legislative in a real sense. Congress has delegated the wage fixing power in the terms of the Act. For two reasons this delegation was and is circumscribed: first, to meet the constitutional requirement that the delegation not be so broad as to permit the delegatee to function as if it were a legislature; and, second, to set forth the congressional guidelines which control the end sought. Congress then sought to safeguard the operation of its delegation by providing for judicial review of the delegatee's decision. The court, therefore, has the duty to hold the delegatee to compliance with the guidelines set forth by Congress. Since the process thus established may be said to have quasi-legislative characteristics, latitude in the reception and consideration of data by the delegatee is greater than in adversary type proceedings, and also perhaps greater latitude may be accorded the subjective decisional process -a matter we need not refine. The reviewing court, however, must be able to trace in the findings upon which the wage rates purport to rest a rational relationship between those findings, the guidelines or standards enacted by Congress, and the result reached, as well as to be able to ascertain that the findings, to be accepted, are supported by substantial evidence. While it may be true, as Judge Leventhal states, that more refinement is to be expected of a permanent administrative agency than of these committees, still there is a limit to the latitude which should be allowed in accepting a conclusion which is not in some discernible manner justified by the agency concerned. It accordingly is our position, assuming the quasi-legislative nature of the proceedings and the special character of the committee, that the reviewing court, to approve the result reached by the delegatee, must be able to determine that the findings given as the foundation of the decision support it. In this respect we think the report is quite deficient. We are fortified in our position by the views of the Chairman of the Committee expressed in his dissent.[9] The findings do not lead in any rational manner to a conclusion, upon the basis of the findings, that the rates are the highest minimum the industry can pay conformably with the factors the statute requires to be considered. They are barren of any economic analysis or rationalization of the situation in the industry which justifies the conclusion that the rates are the highest minimum. Why the rates fixed rather than others were recommended cannot be discerned from the report.
 
 
 22
 As our leading and familiar case of Saginaw Broadcasting Co. v. FCC, supra-which arose on appeal from denial of a license under the Communications Act-makes clear, the need for underlying or basic findings which support the ultimate determination came into our decisions through earlier cases of the Supreme Court concerned with matters of a quasi-legislative character. See United States v. Chicago, M., St. P. & P. R. Co., 294 U.S. 499, 55 S.Ct. 462, 79 L.Ed. 1023 (1935), involving reasonableness of rates under the Commerce Act; United States v. Baltimore & Ohio R. Co., 293 U.S. 454, 465, 55 S.Ct. 268, 79 L.Ed. 587 (1935), involving rules adopted by the Interstate Commerce Commission to insure safety; and Florida v. United States, 282 U.S. 194, 51 S.Ct. 119, 75 L.Ed. 291 (1931), involving reasonableness of rates under the Commerce Act. The agency was acting no less in a quasi-legislative capacity than the Secretary and in the Industry Committee in the case before us. The court in Saginaw Broadcasting quoted from Florida v. United States, supra, at 215, 51 S.Ct. at 125, as follows:
 
 
 23
 The question is not merely one of the absence of elaboration or of a suitably complete statement of the grounds of the Commission's determination, to the importance of which this Court has recently adverted * * * but of the lack of the basic or essential findings required to support the Commission's order. * * *
 
 
 24
 It is inherent in a statutory provision for judicial review, which as here requires findings to be conclusive upon the court when supported by substantial evidence, that the findings support the end result in a discernible manner. It is implicit in decisions under the Fair Labor Standards Act, moreover, that the ultimate result reached be supported by subsidiary findings of the basic facts. See Opp Cotton Mills, Inc. v. Administrator of Wage etc., 312 U.S. 126, 154-156, 61 S.Ct. 524, 85 L.Ed. 624 (1941); Red Star Mfg. Co. v. Grimes, Acting Administrator, 95 U.S.App.D.C. 244, 247-249, 221 F.2d 524, 527-529 (1954).
 
 
 25
 The rationalization advanced by Judge Leventhal of a possible relationship between the Committee's findings and the rates fixed is nowhere found in the Committee's report. It is our colleague's own rather than that of the Committee. Aside from any question as to its acceptability had it been made by the Committee, we cannot import it into the report, especially in light of the orthodox review provisions of the statute. Retail Store Employees Union, Local 400 v. NLRB, supra; Saginaw Broadcasting Co. v. FCC, supra. See Schaffer Transp. Co. v. United States, 355 U.S. 83, 78 S.Ct. 173, 2 L.Ed.2d 117 (1957); National Geographic Society v. District Unemployment Compensation Board, 141 U.S.App. D.C. 313, 438 F.2d 154 (1970). The court simply is not authorized to bridge the gap left by the agency upon which rests the duty to set forth understandable reasons why its conclusions are supported by the record. The court is not the agency.
 
 
 26
 The general situation of the industry in Puerto Rico as shown by the evidence might or might not support the conclusional findings. The basis of the findings made, however, that the industry is unable to pay higher wages under the standards of the Act, is not explicated in a manner to enable the court to sustain the claim of the Secretary that those standards have been met.[10]
 
 
 27
 The court, being unable to sustain the rates, ordinarily would set them aside, if so requested. Though petitioners attack the validity of the rates, the relief they seek is rather an upward modification of the rates, which we cannot grant. But neither can we approve the rates, as requested by the Secretary. No petition to review attacks the rates as excessive. In this situation we resort to our equitable power as a court of review of agency action. See Ford Motor Co. v. NLRB, 305 U.S. 364, 373, 59 S.Ct. 301, 83 L.Ed. 221 (1939). Compare 28 U.S. C. Sec. 2106. In the exercise of this power, in light of the special circumstances confronting us, we do not set aside the rates. We allow them to remain in effect until changed. We remand the case to the Secretary, however, to enable petitioners, if so advised, to obtain further consideration of the matter by an appropriate committee appointed by the Secretary, on petition to that end, followed by a committee report or supplemental report which contains subsidiary findings, supported by substantial evidence, of facts deemed by the committee to sustain any wages recommended as the highest minimum for the industry which, having due regard to economic and competitive conditions, will not substantially curtail employment, and which will not give the industry a competitive advantage over the industry in the United States outside of Puerto Rico. If the present record is deemed inadequate to enable appropriate findings to be made, or if for any other reason it is deemed desirable, further evidence may be adduced, with particular reference to employer ability to pay.
 
 
 28
 Remanded to the Secretary for such further proceedings as are not inconsistent with this opinion.
 
 LEVENTHAL, Circuit Judge (dissenting):
 
 29
 Although I agree that the industry committee's findings are not as informative as they might be, I nevertheless think first, that the committee's reasons are adequately discernible, and second, that we should not require of this committee the same clarity and quality of findings that we require of other types of government agencies. Therefore I cannot join in the majority's opinion and order of remand.
 
 
 30
 * A. As the basis for its December 1969 recommendations of minimum wages for 1970, the industry committee pointed to the generally declining condition of the agriculture industry in Puerto Rico, together with the fact that the wages actually paid to farm workers were not much above the minimum wages made effective February 1, 1969, on the report of the previous industry committee. The only exception was in the cattle-dairy industry, where the minimum wage had been set at 55cents per hour and the prevailing wage was 79cents per hour.
 
 
 31
 The significance of this condition is manifest, in view of the statutory direction to avoid wage increases that will substantially curtail employment in the industry.
 
 
 32
 The condition was explored by the committee in reasonable detail. Its findings, partly quoted, partly paraphrased, and given a numbering sequence, included the following:
 
 
 33
 1. "Between fiscal year 1950 and 1968, the annual average number of workers employed in the entire labor force rose from 596 thousand to 701 thousand, while the number of workers in agriculture dropped from 214 thousand to 91 thousand."
 
 
 34
 (Note: The sharp decline in agricultural workers, to only three-eighths of the number in 1950, underscores the concern to avoid further decrease in employment.)
 
 
 35
 2. "Traditionally, sugarcane, coffee, and tobacco formed the mainstay of Puerto Rico's agriculture."
 
 
 36
 These three crops declined from 35% of farm value of agriculture commodities in crop year 1967/8, to only 28% in 1968/9,-"largely due to the decline in the production and shipment of raw sugar."
 
 
 37
 Coffee production declined from 325,000 hundredweights (1967/8) to 260,000 hundredweights (1968/9).
 
 
 38
 Tobacco grown in Puerto Rico is used exclusively as cigar filler. In recent years, the amount of land in tobacco has dropped off sharply. In 1967-68 production amounted to 112,000 hundredweights and in 1968-69 was 80,000 hundredweights. The farm value of production has had a corresponding loss.
 
 
 39
 3. "Pineapples are the most important of the fruit crops. Production on a commercial scale is a relatively recent development on the island and most of the pineapple crop is shipped fresh to the U.S. mainland." "Although there was a substantial gain in output in this 4-year period [from 1961-2, 57,000 tons, to 1964-5, 80,000 tons] the upward trend was interrupted. The quantity of production steadily declined with production in 1968-69 amounting to 55 thousand tons." Most of the field crops have had a "tendency to decline or remain stable in the past 5 years."
 
 
 40
 4. The island's general progress has increased the demand for and production of livestock products, milk and eggs.
 
 
 41
 5. The committee set forth a table derived from a May 1969 government survey, showing the low wages paid: Down to a figure of about 55.4cents per hour to labor in coffee planting and tobacco, the highest earnings (about 80cents) to workers in cattle and dairy farms.
 
 
 42
 B. The committee also relied on Act No. 142, effective June 30, 1969, in which the Puerto Rican legislature provided a government subsidy to farm workers equal to the difference between their actual wages and the following target wage per hour: 80cents for 1969-70, 90cents for 1970-71, and $1.00 for 1971-72. This is obviously significant since it serves to counteract, at least prima facie, any substantial inference that although low wages were actually paid nevertheless Puerto Rican agriculture was a fairly rich and prosperous industry that could well afford to pay its workers more without going out of business, but chose instead to grind its workers beneath the heel of low wages. The statistics show that as late as May, 1969, agricultural workers made up between 11 and 12 percent of Puerto Rico's working population (App. 125). It is a reasonably solid inference that the legislature would not have granted a subsidy to such a large segment of the population unless it felt that the employers themselves could not afford to pay as wages what the legislature deemed a minimum income for these employees.
 
 
 43
 Moreover, as the labor members of the committee protested, the very existence of this subsidy meant that a decision by the committee to raise minimum wages in a particular farm industry would impose a burden on the employers grossly disproportionate to any benefit received by the workers. As to the subsidy for 1969-70, an increase in minimum wage from 50cents to 80cents per hour would result in no real gain to the employees; it would simply shift the burden of paying 30cents per hour from the Government to the farmers. If the increase were from 50cents to $1 per hour, the workers would still receive only a 20cents net raise, or 25% (20/80) while this would mean a doubling of labor costs. Even the protesting labor members recognized that with this subsidy as a fact, it would be unwise "to seek increases that will hurt the farmers without helping the farm workers." (App. 16).
 
 
 44
 Thus I have no trouble finding support for the committee's recommendations and for its conclusion that those recommendations are the highest wage rates which "will not substantially curtail employment in the industry." Employment is threatened by rising labor costs; especially for an industry beset by low demand curves.
 
 II
 
 45
 These matters were not spelled out by the committee in the way we have come to expect of government agencies. I am willing to assume that conventional doctrines of administrative law would justify a remand for clarification of the findings. See SEC v. Chenery Corp., 318 U.S. 80, 63 S.Ct. 454, 87 L.Ed. 626 (1943). But I do not think that remand is appropriate in this case.
 
 
 46
 A. First, a remand for findings was not the relief requested by the Union. The Union wanted a declaration that an industry committee must apply a minimum wage of $1.30/hour unless it can justify a lower rate through a cost survey showing that the employers could not meet this minimum. The Union stated (Br. 16) that the only adequate remedy would be judicial modification of the current order to provide a $1.30 minimum wage, and that the "only alternative, an order to convene a new industry committee, allows the covered employees no present relief at all."
 
 
 47
 Whatever merit this contention might have in an industrial situation, where it is meaningful to talk of "cost surveys," it is out of place in the context of Puerto Rican agriculture. The evidence showed that two-thirds of the farmers in Puerto Rico have less than a sixth-grade education (App. 49), and that few farmers keep record books and accounts. Even if the committee took a cost survey of the larger farms, which might keep such accounts, this would tell us nothing about the financial position of the more numerous small farms.
 
 
 48
 The Union may well not have brought the appeal if the only relief available were an evaluation by a new committee, yet the court is providing for further proceedings in which it may have little interest.
 
 
 49
 B. The key problem for me, however, is in defining what kind of "findings" are required of industry committees in Puerto Rico by Sec. 8(d) of the Act, in the context of its "findings and recommendations."[1]
 
 
 50
 Section 8 of the Act, as originally passed in 1938, set up industry committees for the purpose of fixing minimum wages in specified industries in the United States. These committees were to base their recommendations on the highest wage, up to a set maximum, that would not substantially curtail employment in the particular industry. But the recommendation of a domestic industry committee was only advisory; the Administrator had authority to reject it, and Sec. 8 specifically gave the Administrator authority to remand to the committee for further consideration and recommendations. Act of June 25, 1938, ch. 676, Sec. 8(d), 52 Stat. 1064-65. In 1949 Section 8 was amended so as to omit all reference to domestic industry committees; their task was completed.
 
 
 51
 Since 1949, Sec. 8 has referred only to industry committees to make recommendations as to wages payable in Puerto Rico and the Virgin Islands. Initially the provision for remand by the Administrator to the industry committee was retained. Act of October 26, 1949, ch. 736, Sec. 8, 63 Stat. 916. In 1955, however, the Act was amended to provide that the Secretary (replacing the Administrator) was obligated to accept the committee's recommendations and translate them into an order. The power to remand was deleted. Act of August 12, 1955, Pub.L. No. 84-381, Sec. 5(d), 69 Stat. 712.
 
 
 52
 The lack of any discretion on the part of the Secretary in adopting the recommendations of the industry committee puts a dilemma to this court. We could vacate the Order of the Secretary if illegal. But when we remand, we can remand only to the Secretary whose Order is before us. We cannot ask the Secretary to tell us the reasons for the committee's actions beyond what the committee has told him. His may have been the hand of Esau that issued the order, but the voice of Jacob as to underlying reasons was the report of the committee.
 
 
 53
 C. The difficulty of handling this appeal is intensified by the fact that the relief sought by the petitioner is a $1.30 order. Petitioner does not spell out its theory. The order before us was issued by the Administrator (presumably as delegatee of the Secretary) on January 27, 1970, effective February 13, 1970. This order increased the minimum wages prescribed by the previous wage order which went into effect on February 1, 1969, an order issued on the report of a prior industry committee which met in December, 1968. The Secretary was not required to convene another industry committee until December 1970, see Section 8(a). On November 1, 1969, the Secretary exercised his discretionary authority and established Industry Committee No. 89-A, which in December 1969 made the report, recommending increases, that the court now deems inadequate. If this is invalid, it might well have the effect of reinstating the order that became effective February 1, 1969 -which was presumably effective until validly superseded.
 
 
 54
 D. The majority opinion grapples with its problem by structuring a kind of anticipatory mandamus. It orders a remand on the basis that if petitioner should press a point that has not been pressed before us, then the Secretary should appoint an industry committee, which should govern itself by the standards laid down by the court. And all this is laid out by way of providing a relief, requirement of a determination by a new committee, that the petitioner Union brushed aside because it "allows the covered employees no present relief at all."
 
 
 55
 There are times in which a court may soundly expatiate on the requirements of the law for the guidance of future proceedings. But I see no reason for the unusual remand order. The majority seem to consider it improper somehow, beneath the dignity of a court as it were, to affirm an order that the court considers has defects. This is not a sound approach to the judicial function. Indeed it is a routine judicial function to affirm an agency's order that is subject to a defect that has not been properly preserved, and that judicial function may well be a judicial obligation. Colorado Interstate Gas Co. v. FPC, 324 U.S. 581, 65 S.Ct. 829, 89 L.Ed. 1206 (1945). There may be an exception for actions that violate the fundamentals of law that protect basic human rights, but that is not the kind of problem before us in this case.
 
 
 56
 E. What I think this case calls for is a recognition that while there are rules of administrative law to govern administrative agencies, the procedures are not necessarily applicable across the board. There are special situations, requiring individualized approaches.
 
 
 57
 While Sec. 8(d) of the Fair Labor Standards Act is couched in familiar terms of "findings of fact," this language harks back to the time that the Administrator had the real power of decision. The "findings" expected of an industry committee were subject to control by the Administrator. The 1955 amendment giving unusual authority to the committees dealing with Puerto Rico and the Virgin Islands, providing that their recommendations must be accepted by the Secretary, was not due to a basic revision of legislative attitude to such tri-partite committee, but only to a limited revision for Puerto Rico and Virgin Islands. This is demonstrated by the fact that in the subsequent minimum wage legislation passed in 1966 for the District of Columbia, Congress again provided for such ad hoc tripartite committees, instructing them to prepare a "report containing its findings and recommendations," but made them only advisory, subject to revision by the permanent government officials, the D. C. Commissioners. 36 D.C.Code (1967 ed.) Secs. 406, 407.
 
 
 58
 The point I am making is that what Congress contemplated for "findings" of such ad hoc tri-partite committees must take into account their distinctive nature. They are relatively informal and usually only advisory. They were given authoritative powers only in the case of Puerto Rico and the Virgin Islands where Congress was acting as a territorial legislature, or more accurately a super-territorial legislature. These territorial provisions, like provisions of state laws, are not necessarily controlled by our general doctrine of Federal administrative law, except as they are required by considerations of inherent reasonableness.
 
 
 59
 Though I agree that a wage order would be defective if it stated no findings and reasons, nevertheless we should honor the "salutary principle of judicial restraint" in regard to the kind of findings we require of a Puerto Rico industry committee. Greater Boston TV Corp. v. FCC, 143 U.S.App.D.C. 383, 444 F.2d 841 (1970), cert. denied, 402 U.S. 923, 91 S.Ct. 2233, 29 L.Ed.2d 701 (1971). This is especially true where, as here, the complaint to this court was not over the committee's findings, but over its approach in getting evidence. When I add to the equation the fact that the industry committee, unlike a conventional administrative agency, had no staff or lawyer of its own, and had to rely on the Secretary for its services, I am all the more certain that we should not expect the same kind of findings that we might properly demand of, say, the FCC, see Saginaw Broadcasting Co. v. FCC, 68 App.D.C. 282, 96 F.2d 554, cert. denied, 305 U.S. 613, 59 S.Ct. 72, 83 L.Ed. 391 (1938).
 
 
 60
 A crucial point is that the industry committee for Puerto Rico wages is an ad hoc tri-partite committee, not a continuing agency. Section 5(b) of the Act provides that the committee "shall include a number of disinterested persons representing the public, * * * a like number of persons representing employees in the industry, and a like number representing employers in the industry." The members of this ad hoc committee have other full-time jobs. Its members come together for one function and then separate, like a mediation board appointed by the President for labor management disputes. In contrast, an ordinary administrative agency is a continuing agency; all of its members are taken to represent the general public interest; and the entity stays the same although its members may change. Braniff Airways, Inc. v. CAB, 126 U.S. App.D.C. 399, 379 F.2d 453 (1967).
 
 
 61
 In my view the majority has failed to take into account (a) the unique characteristics of these tri-partite committees, and (b) the unique conditions pertinent to the Virgin Islands and Puerto Rico.[2] Congress had no permanent Federal officials at hand with continuing responsibility for wages in these islands. There were territorial officials located in the islands, but Congress was interested in decisions that would avoid wage rates fixed so low as to continue undue competitive advantages over the mainland. I see no reason to suppose that Congress believed that the reports, techniques and methods of these tri-partite committees, normally advisory, were to be substantially changed by the fact that they became mandatory as to wages in Puerto Rico and the Virgin Islands.
 
 
 62
 What I would demand of these Committees is a requirement of basic reasonableness, rather than the more rigid standards applied to conventional administrative agencies. When I look to the committee's performance in this case, I am convinced that it met this requirement. The committee was faced with an almost impossible task, and it did the best it could with a kind of gradualistic approach,-to make some wage increases, to move toward the U. S. minimum wage, but at a pace that was not so rapid as to have it court bankruptcies. While its report would not satisfy me for a conventional agency, I am sufficiently able to discern its path, see Colorado Interstate Gas Co. v. FPC, 324 U.S. 581, 595, 65 S.Ct. 829, 89 L.Ed. 1206 (1945), that I would not discuss a legal requirement not asked for by appellant.
 
 
 63
 In speaking for special consideration of the special nature of these committees, and the special subject-matter, I am not departing from accepted doctrine. General doctrines of administrative law are pragmatic and even plastic, and conventional criteria are not enforced when the situations and agencies have a special characteristic. As to special situations, the Supreme Court has expressly held that in the light of practical considerations, and the interest of avoiding undue prolongation of proceedings, it would affirm orders even of a conventional administrative agency (FPC), notwithstanding the fact that the accompanying findings failed to "articulate the general principles" accounting for a key determination and thus had palpable "weaknesses." FPC v. Sunray DX Oil Co., 391 U.S. 9, 38-40, 88 S.Ct. 1526, 20 L.Ed. 2d 388 (1968); see also Trans World Airlines, Inc. v. CAB, 128 U.S.App.D.C. 126, 147-148, 385 F.2d 648, 669-670 (1967), cert. denied, 390 U.S. 944, 88 S.Ct. 1029, 19 L.Ed.2d 1133 (1968).
 
 
 64
 As to special agencies, it has long been recognized, by the Supreme Court and this court, that actions of the National Mediation Board in railway labor disputes are subject to a much narrower scope of judicial review than administrative actions generally. See e. g., Switchmen's Union of North America v. National Mediation Board, 320 U.S. 297, 64 S.Ct. 95, 88 L.Ed. 61 (1943); International Ass'n of Machinists and Aerospace Workers v. National Mediation Board, 138 U.S.App.D.C. 96, 425 F.2d 527 (1970).
 
 
 65
 The unstated premises of the majority opinion seem to me to be that an agency is an agency is an agency, that findings are findings are findings, and that the principles of judicial review are fully and equally applicable to all agencies. I would invoke a more flexible conception of the purpose and implications of judicial review. In providing the kind of judicial review that I think appropriate for an industry committee kind of agency concerned with the unique subject of minimum wages in the relatively depressed area of Puerto Rico, making an essentially legislative judgment as to a viable rate of transition toward equality with continental wages, I conclude that the order before us is reasonable and should be affirmed.
 
 
 66
 I respectfully dissent.
 
 
 
 [1]
 See heading for fuller description
 
 
 [2]
 Substituted for the Administrator under the authority of Reorganization Plan No. 6 of 1950, Sec. 1, 64 Stat. 1263
 
 
 [3]
 Section 205(d) provides:
 (d) The [Secretary] shall submit to an industry committee from time to time such data as he may have available on the matters referred to it, and shall cause to be brought before it in connection with such matters any witnesses whom he deems material. An industry committee may summon other witnesses or call upon the [Secretary] to furnish additional information to aid it in its deliberations.
 
 
 [4]
 The first industry committee for Puerto Rico under the statutory plan was appointed in March, 1967. It divided the agricultural industry into classifications and recommended minimum wage rates which became effective in two steps- first, April 28, 1967, and second, February 1, 1968. In December, 1968, another industry committee was appointed, which recommended still further rate increases, effective February 1, 1969. These were the rates in effect at the time of the proceedings at issue in the case at bar
 
 
 [5]
 The dissenting opinion of the labor members of the Committee states that the rates in the order "were without exception below the 80 cent minimum wages now being paid under Act No. 142." This statement is incorrect
 
 
 [6]
 
 Classification Minimum
 Wage
 Rate
-------------------------------------------------------------------- ---------
Dairy farms, drivers and arts and crafts workers $1.10
Dairy farms, tractor operators 1.05
Dairy farms, other workers .76
Cattle .72
Pineapple farms, drivers, tractor operators or operators of any .95
 other agricultural motor machinery, arts and crafts workers, and
 any other similar occupation
Pineapple farms, other workers .68
Tomatoes, peppers, aviculture and floriculture .66
Tobacco, coffee, and other agricultural activities .58
 
 
 [7]
 We leave open the question whether in certain circumstances a committee might require the industry to assume this burden
 
 
 [8]
 In other situations not before us we do not intimate that the more persuasive data might not be required. See note 7 supra
 
 
 [9]
 The Chairman said in part:
 I dissent from the recommendation of the majority of the Committee inasmuch as my evaluation of the record before the Committee leads me to conclude that there are insufficient grounds upon which to keep Federal minimum wage rates in General Agricultural Industry from advancing by substantially greater amounts than those recommended by a majority of the Committee.
 The record before us contains virtually no valid data on the financial condition of the industry, and certainly no data which could show that substantial increases in Federal wage minima would have an adverse impact on the industry and its workers. The record does not, in my opinion, yield any other compelling, convincing or indicative grounds for setting the Federal wage minima at levels so far below the legally permissible minimum for agriculture.
 
 
 [10]
 While the report states that the ultimate findings are made "in view of these [Findings of Fact] and on the basis of the entire record," the "Findings" referred to utterly fail to support the conclusions reached, indeed are quite unrelated to those conclusions. See p. 1167 supra. And the reference to "the entire record" is of course not a finding
 
 
 [1]
 "(d) The industry committee shall file with the Secretary a report containing its findings of fact and recommendations with respect to the matters referred to it. Upon the filing of such report, the Secretary shall publish such recommendations in the Federal Register and shall provide by order that the recommendations contained in such report shall take effect upon the expiration of 15 days after the date of such publication."
 
 
 [2]
 As to matters involving Puerto Rico and the Virgin Islands, even the Constitution does not follow the flag in all respects; thus it does not pertain to these offshore islands with respect to the requirement of uniform duties, import and excise taxes laid by Congress. Downes v. Bidwell, 182 U.S. 244, 21 S.Ct. 770, 45 L.Ed. 1088 (1901)