SINDICATO PUERTORRIQUENO DE TRABAJADORES, affiliated with Amalgamated - Meat Cutters and Butcher Workmen of North America, et al., Petitioners,

v.

Peter J. BRENNAN, Secretary of Labor, United States Department of Labor, et al.

No. 74–1980

United States Court of Appeals, District of Columbia Circuit.

Argued Sept. 24, 1975.

Decided Jan. 26, 1976.

Wilkey, Circuit Judge, filed concurring opinion.

1. The order appears at 39 Fed.Reg. 31316 (August 28, 1974); App. A1–3.

Marsha Siegel Berzon, Washington, D. C., for petitioners. J. Albert Woll, Washington, D. C., was on the brief for petitioners.

Carin Ann Clauss, Associate Sol., U. S. Dept. of Labor, of the bar of the Court of Appeals of New York, pro hac vice, by special leave of court, with whom Sylvia S. Ellison and Helen W. Judd, Attys., Dept. of Labor, Washington, D. C., were on the brief for respondents.

Before LEVENTHAL, ROBB and WILKEY, Circuit Judges.

LEVENTHAL, Circuit Judge:

This is a petition, filed pursuant to § 10(a) of the Fair Labor Standards Act (Act), 29 U.S.C. § 210(a) (1974), to review an August 28, 1974, wage order of the Secretary of Labor establishing a scale of minimum wage rates for several classifications of Puerto Rican agricultural workers.[1] Petitioners are a labor organization representing agricultural employees in Puerto Rico and several agricultural employees, on their own behalf and as representatives of their class. They ask this court to modify the challenged wage order, which establishes rates ranging from $1.28 to $1.45 an hour for most employees, and up to $1.60 an hour for certain skilled employees, by raising all the minimum wage rates to $1.60 an hour, the 1974 statutory minimum for continental agricultural employees. Petitioners contend that the mandate of the 1974 Amendments has not been followed. We find substantial compliance with the statutory requirements and affirm.

## I. BACKGROUND

### A. *The Statute*

In order to avoid major dislocations to the economy of Puerto Rico that could result from automatic application to the generally faltering industries on the island, of the wage standards set under the Act for the continental United States, Congress provided special standards and machinery. It delegated minimum wage-setting responsibility to *ad hoc* industry committees, convened by the Secretary under § 8(a), 29 U.S.C. § 208(a). In accordance with § 5, 29 U.S.C. § 205, the Secretary appoints to these tripartite bodies an equal number of members representing the public, employers in the industry, and employees in the industry, and aids in securing the information and witnesses necessary to committee deliberations.

The mandate of § 8(a) is "to reach as rapidly as is economically feasible without substantially curtailing employment" the ultimate objective of parity with the mainland rates. Section 8(b), as amended in 1974, requires the special industry committee, after investigating conditions in the industry, hearing witnesses and receiving all necessary evidence, to

recommend to the Administrator the highest minimum wage rates for the industry which it determines, having due regard to economic and competitive conditions, will not substantially curtail employment in the industry, and will not give any industry in Puerto Rico or in the Virgin Islands a competitive advantage over any industry in the United States outside of Puerto Rico and the Virgin Islands; except that the committee shall recommend to the Secretary the minimum wage rate prescribed in section 206(a) or 206(b) of this title, which would be applicable but for section 206(c) of this title, unless there is substantial documentary evidence, including pertinent unabridged profit and loss statements and balance sheets for a representative period of years or in the case of employees of public agencies other appropriate information, in the record which establishes that the industry, or a predominant portion thereof, is unable to pay that wage.

29 U.S.C. § 208(b).

After the committee has made its findings of fact and recommendations, it

is required by § 8(d) to file with the Secretary its report, which the Secretary "shall publish . . . in the Federal Register and shall provide by order that the recommendations contained in such report shall take effect upon the expiration of 15 days after the date of such publication." 29 U.S.C. § 208(d). Any person aggrieved by such an order may obtain review by a court of appeals, which "shall have exclusive jurisdiction to affirm, modify (including provisions for the payment of an appropriate minimum wage rate), or set aside such order in whole or in part, so far as is applicable to the petitioner. The review by the court shall be limited to questions of law, and findings of fact by such industry committee when supported by substantial evidence shall be conclusive." § 10(a), 29 U.S.C. § 210(a).

This process is repeated every two years until the wage rates in Puerto Rico meet the minimum standards for the mainland United States.[2]

## B. The 1974 Order

The 1974 wage order under review was set by Industry Committee No. 122, which had been appointed on February 12, 1974, for the purpose of reviewing the 1972 wage orders for the agriculture industry of Puerto Rico. The latter established rates for general agriculture of $1.05 and $1.15 an hour and for sugar cane of 70 cents and $1 an hour, with higher rates for certain skilled employees in general agriculture ($1.30) and in sugar cane ($1.20).[3] The 1974 Amendments, passed April 8, 1974, and effective May 1, 1974, required all such rates under $1.40 to be increased by 12 cents an hour.[4] Industry Committee No. 122 met from June 24, 1974 through June 28, 1974. The record it developed comprised three and one-half days of testimony and 36 exhibits. It voted to increase the wage rates further, so as to establish parity with the mainland rate of $1.60 for the relatively skilled workers in general agriculture and sugar cane farming. But it set rates ranging from $1.28 to $1.45 for the other classifications.[5] Its

---

2. The statute also sets a rock-bottom minimum wage for Puerto Rico of 60% of the applicable mainland rate or $1.00 an hour, whichever is higher, § 6(c)(4)(A), 29 U.S.C. § 206(c)(4)(A), and provides for automatic annual increases of 12¢ an hour for wage rates under $1.40 an hour and 15¢ an hour for rates over $1.40, § 6(c)(2)(A), (B), 209 U.S.C. § 206(c)(2)(A), (B). But since the mainland minimum for agriculture rises 20 cents a year (at least until December 31, 1977), § 6(a)(5), 209 U.S.C. § 206(a)(5), convergence between the island and the mainland can take place only by industry committee action.

3. Brief for Respondents at 4; 29 C.F.R. § 727.2 (1974). The rates for all workers in the agriculture industry with the exception of the category of relatively unskilled "other workers" on coffee and tobacco farms were recommended by Industry Committee No. 106, and became effective on February 28, 1972. The rates for "other workers" on coffee and tobacco farms were recommended by Industry Committee No. 109–C, and became effective on August 11, 1972. App. A84.

4. 29 U.S.C. § 206(c)(2)(A)(i) (1974).

5. The minimum wage rates were increased as follows:

| Classification | 1972 Wage Order Rates | Increases Mandated by 1974 Amendments (eff. 5/1/74) | 1974 Wage Order Rates (eff. 9/13/74) |
|---|---|---|---|
| General Agriculture Other than Sugar Cane Farming | | | |
| Drivers, tractor operators and machinery operators | $1.30 | $1.42 | $1.60 |
| Milkers | $1.30 | $1.42 | $1.60 |
| Craftsmen | $1.30 | $1.42 | $1.60 |
| Other Workers | | | |
| On livestock, dairy and pineapple farms | $1.15 | $1.27 | $1.40 |
| On tobacco, coffee and other farms | $1.05 | $1.17 | $1.28 |

report was submitted on June 29, 1974,[6] and the Secretary's wage order issued on August 28, 1974.

While the Committee voted unanimously to approve the recommended rates, the three labor members did so reluctantly, "in the interest of securing minimum wage rate recommendations at levels as nearly approaching $1.60 as obtainable. . . ."[7] The labor members filed a separate statement setting forth their legal objections to the fixing of rates below the $1.60 mainland minimum.[8] This petition for review followed.

### C. *Petitioners' Contentions*

Petitioners claim a failure to comply with § 8(b) of the Act, insofar as it was modified by the 1974 Amendments to require the industry committee to recommend the mainland rate "unless there is substantial documentary evidence, including pertinent unabridged profit and loss statements and balance sheets for a representative period of years . . . in the record which establishes that the industry, or a predominant portion thereof, is unable to pay that wage."

Petitioners' first challenge goes to the form of the evidence—the absence of profit and loss statements. We shall discuss this in part III, but state the contention here to add perspective. Read-ing the phrase added to § 8(b) in 1974 as requiring profit and loss statements establishing inability to pay the mainland rates on the part of "a predominant portion" of the industry as a precondition to the consideration of lower rates, the labor members asserted that the employers failed "to adduce evidence legally sufficient to rebut the statutory presumption that the mainland minimum wage rate for this industry should apply,"[9] and therefore "no course is legally permissible . . . except to go to $1.60."[10]

### II. FINDING ON INABILITY TO PAY

We begin with petitioners' second contention which appears for the first time in their briefs and at argument. Petitioners argue that this court must institute the mainland rate of $1.60 because the Committee failed to address in specific terms the threshold issue of inability to pay, and therefore left standing the statutory presumption in favor of the mainland minimum, depriving the Committee of authority to set a lower rate.

We hold this contention barred by § 10(a) which prevents this court from considering an objection to the Secretary's wage order "unless such objection

| Classification | 1972 Wage Order Rates | Increases Mandated by 1974 Amendments (eff. 5/1/74) | 1974 Wage Order Rates (eff. 9/13/74) |
|---|---|---|---|
| *General Agriculture Other than Sugar Cane Farming* | | | |
| *Sugar Cane Farming* Drivers, mechanical loader operators, harvesters and sowers | $1.20 | $1.47 | $1.60 |
| Operators of other mechanical equipment and craftsmen | $1.00 | $1.47 | $1.60 |
| Other workers | $0.70 | $1.22 | $1.45 |

Source: 29 C.F.R. § 727.2 (1974); 39 Fed.Reg. 31316 (August 28, 1974).

6. App. A3–38.

7. App. A39.

8. App. A39–45.

9. App. A39.

10. App. A47.

shall have been urged before such industry committee or unless there were reasonable grounds for failure so to do." 29 U.S.C. § 210(a). We discern no indication, in the separate statement of the labor members of the Committee or in other parts of the record as filed, that this particular objection was raised before the Committee.[11] The thrust of the labor members' statement, and of the debate and voting within the Committee, was to the absence of profit and loss statements for a predominant part of the industry. Indeed, Thomas Harris, spokesman for the labor members, conceded the inability of the farmers to pay the mainland rate, but stood on the ground that the absence of the requisite profit and loss statements rendered no other course "legally permissible."[12]

We discern no reasonable grounds for petitioners' failure to raise their second objection before the Committee,[13] particularly since it was one that could readily have been righted, on the basis of the record evidence had there been timely assertion. While there was no formal finding on inability to pay,[14] such a determination was made in substance, and was certainly an implicit premise of the Committee's report, the labor members' statement and the debate on their objections. The Committee justified its recommendations for rates below the mainland minimum with respect to non-sugar cane farms in terms of generally slim or non-existent profit margins obtaining there and the continuing need for the Commonwealth Government to subsidize previous increases in farm worker minimum wages,[15] and with respect to sugar cane farms in terms of the losses sustained in previous crop years.[16] Mr. Harris agreed "that the farmers probably can't afford to pay

11. Any broad language in the labor members' separate statement as to "the failure of the employers to adduce evidence legally sufficient to rebut the statutory presumption" (App. A39) or to the fact that the evidence was "lacking in specificity" (App. A45) must be read in light of the general thrust of their objection, as formulated in their statement and in their motion before the Committee to recommend the mainland rate. The Committee members understood their dissenting colleagues to be objecting to the absence of profit and loss statements, rather than to any failure to make specific findings on inability to pay, *see* App. A48, A56–59, A66–69, and the labor members did not attempt to dispel this impression.

12. I . . . respectfully urge that the committee has no course it can legally follow except to go to $1.60 in all cases.

In urging this I am *not insensitive* that it may work a hardship on the farmers. The fact is that on this record it appears that the farm workers probably can't live on the wage they are getting paid, and we have a vague suspicion that the farmers probably can't afford to pay more. The fact that the Island Commonwealth Government is paying this wage subsidy at least suggests that the Commonwealth Government feels that. I am sure than an increase to $1.60 might have a very upsetting effect on the farmers of Puerto Rico, and it might very likely have to be met by some kind of emergency Government program to take care of the situation, to provide an additional supplement, or whatever else the Government wanted to do. But I strongly urge that no course is

legally permissible for us except to go to $1.60.
App. A47.

13. Petitioners were not dependent on the labor members of the Committee to raise their particular objections. Section 511.8 of the Labor Department Regulations, 29 C.F.R. § 511.8 (revised eff. May 22, 1974), permits any employer or employee, individual or group, in the agriculture industry of Puerto Rico who wishes to participate on his own behalf or by counsel to file a prehearing statement, and if the statement contains the information required by § 511.8(b) he is accorded party status. Even if a prehearing statement has not been filed, § 511.8(d) gives the committee discretion to permit the offering of testimony in "exceptional circumstances." And even after the industry committee submits its report and recommendations, and the Secretary has published the recommendations and provided by order for their effectuation, under § 511.19 "[a]ny interested person may at any time file a petition . . . for an amendment to a wage order applicable to him."

14. It should be noted that the Committee did in its formulation of its ultimate conclusion restate the language of § 8(b), as amended. *See* App. A36. Ordinarily, however, a concluding paragraph merely restating the statutory language is not an adequate substitute for required findings.

15. App. A30–32. See text at pp. 1030–1032 *infra*.

16. App. A34. *See* text at pp. 1030–1032 *infra*.

more" without "some kind of emergency Government program" to provide further subsidies.[17] The labor members conspicuously avoided any debate on the merits of establishing parity with the mainland, focusing on the nature of the evidence required by § 8(b) to rebut the statutory presumption.[18]

No challenge was raised either by the labor members or the petitioners to the substantiality of the evidence underlying the Committee's recommendations, and, as we shall later develop, there was no infirmity in the nature of the evidence relied upon. In the review of administrative agencies, courts require formal findings, tracking the language of the pertinent statutory criteria, in the belief that insistence on proper form assures that agencies will focus on the exact issues and think through matters more clearly. Even in the case of conventional agencies, however, courts do not always require agencies to dot their "i's" and cross their "t's". "Courts are indulgent toward administrative action to the extent of affirming an order where the agency's path can be 'discerned' even if the opinion 'leaves much to be desired.' " *WAIT Radio v. F. C. C.,* 135 U.S.App. D.C. 317, 320, 418 F.2d 1153, 1156 (1969). The present setting, moreover, involves the deliberations of an *ad hoc* administrative body of laymen generally unfamiliar with administrative procedures, and we do not think it appropriate to insist on strictest adherence to procedural formality. The Committee was dealing with an amendment passed only a few months before it began its deliberation,[19] and while a determination of inability to pay was made a prerequisite the amendment did not set forth in terms the requirement that this inability be the subject of a formal "finding." In the circumstances of this case, we find substantial compliance with the statutory requirement, and do not think the public interest in sound administration or any other aspect of the interest of justice, 28 U.S.C. § 2106, requires a remand to recast the language of the report to make explicit its abundantly apparent operative premise.

## III. THE PROFIT AND LOSS DATA REQUIREMENT

 We turn to the more difficult contention: that the participial "including" phrase added to § 8(b) in 1974 requires that the threshold inability to pay determination be based on profit and loss statements for the predominant part of the agriculture industry of Puerto Rico.[20] The Committee did not have before it data in this form for a predominant part of the industry. Indeed, only

17. *See* note 12 *supra.*

18. *See* note 11 *supra.*

19. *See* note 39 *infra.*

20. The labor members of the Committee also cited Labor Department Regulations, 29 C.F.R. §§ 511.10(a), 511.13, 511.8(b) (revised eff. May 22, 1974), in support of their position. App. A40–42, A64.

Section 511.10(a) merely restates the statutory language. Section 511.13 requires that Testimony on behalf of an employer or group of employers as to inability to pay the minimum wage rates specified in paragraph (1) or (5) of section 6(a) or 6(b) of the Act, whichever would be applicable, or as to inability to adjust to a higher minimum wage rate than prescribed by any applicable wage order of the Secretary, shall be supported by tangible objective data filed as part of a prehearing statement under § 511.8, including pertinent unabridged profit and loss statements and balance sheets for a representative period of years for the individual firm or firms involved.

Section 511.8(b) provides that "[a]ny interested person who wishes to participate on his own behalf or by counsel shall file a written prehearing statement," which shall contain certain specified information, "including all tangible objective data to be submitted pursuant to § 511.13. . . . ."

These regulations are not particularly helpful to petitioners' cause. They were not cited in the briefs or relied on at oral argument. This court has previously held that these sections go only to the showing required of those employers who come before the Committee as individual parties asserting their inability to pay, rather than to that required of the covered industry generally. *See Sindicato Puertorriqueno de Trabajadores v. Hodgson,* 145 U.S. App.D.C. 238, 243, 448 F.2d 1161, 1166 (1971). *See also* note 13 *supra.* In any case, we are left with the same problem of how to construe the participial "including" phrase.

one farmer provided the Committee with profit and loss statements for his farm.[21]

We hold that the clause beginning with the participle "including" was intended to identify the kind of information that Congress required, not to impose a mandate regarding the exclusive competency of accountant-type profit and loss statements. The Act does not require profit and loss statements as such. Indeed, counsel for petitioners, when pressed at oral argument, conceded as much, but argued that the permissible substitute must be "something equivalent," with the "same level of detail."

What Congress intended by the 1974 Amendment of § 8(b), which perpetuated our decision in *Sindicato Puertorriqueno de Trabajadores v. Hodgson*, 145 U.S. App.D.C. 238, 448 F.2d 1161 (1971) (*Sindicato I*), remanding an earlier wage order for further proceedings, was that the Committee's inability to pay finding be based on reliable evidence that would be documentary rather than subjective and impressionistic. Congress was aware of the difficulties in obtaining profit and loss statements from the many uneducated, marginal farmers on the island, and it did not intend to prohibit the use of material that could fairly be regarded as a reasonable equivalent of profit and loss data. In our view, the kind of evidence relied upon by Industry Committee No. 122 was such a reasonable equivalent, and constituted "substantial documentary evidence" in support of its rebuttal of the statutory presumption.

In *Sindicato I*, we specifically rejected the argument that profit and loss statements were required. Finding that "most farmers simply do not have this type of information and . . . about two-thirds of the farmers have attended schools for less than six years," the court held that "the Committee is not precluded from making recommendations on the basis of evidence which is available." 145 U.S.App.D.C. at 243, 448 F.2d at 1166. The legislative history reflects no dissatisfaction with that ruling.

What prompted the court's remand was not the form of the evidence, but rather its conclusion that there was an absence of any evidence or intermediate findings on why the recommended rates were the highest wage rates which would not substantially curtail employment or give Puerto Rican industry an undue competitive advantage over the mainland.[22] The court's remand was a response to the hopelessness of its reviewing task when the record is "barren of any economic analysis or rationalization of the situation in the industry which justifies the conclusion that the rates are the highest minimum," when "[w]hy the rates fixed rather than others were recommended cannot be discerned from the report." *Id.* at 246, 448 F.2d at 1169.

Congress, in amending § 8(b), sought "to correct the fault which the *Sindicato* decision exposed," and considered the amendment to be "consistent with the rationale of that case."[23] Congress' aim was to ensure that industry committee determinations "be based on record-evidence adequate to reveal the financial and economic condition of the covered employers," so that these proceedings

---

**21.** Mr. Luis R. Berrios, president of the Puerto Rico Farm Bureau, an organization representing farmers, presented financial statements for his dairy farm covering 1971–73. App. A21. *See* text at 1032 and note 37 *infra.*

**22.** The report of Industry Committee No. 89–A, involved in *Sindicato I*, is reproduced in the Brief for Respondents at A1–10, and described in the prior *Sindicato* opinion at 145 U.S.App. D.C. at 244, 448 F.2d at 1167.

**23.** H.Rep.No.93–232, 93d Cong., 1st Sess. 26 (1973). We rely on this committee report, as do petitioners, even though the bill to which it refers, H.R. 7935, was vetoed by the President after passing both houses, because the lan-

guage of § 8(b), as amended, was first proposed in H.R. 7935, and this report contains the only extended discussion of the purpose behind the section's amendment in 1974. *Compare* the reports prepared in connection with S. 2747 and H.R. 12435, a combination of which was enacted as the 1974 Amendments and which contain the same wording as H.R. 7935 for the amendment to § 8(b). H.Rep.No. 93–913, 93d Cong., 2d Sess. 25–26 (1974); S.Rep.No.93–690, 93d Cong., 2d Sess. (1974); S.Rep.No.93–758, 93d Cong., 2d Sess. (1974); H.Rep.No.93–953, 93d Cong., 2d Sess. (1974); U.S.Code Cong. & Admin.News 1974, p. 2811.

would no longer "degenerate . . . into a process by which a majority of the members work their will knowing that the record is bare of the facts necessary to controvert their argument that higher wages would substantially curtail employment." [24] It is significant that the proponents of the amendment did not identify the problem exposed by *Sindicato I* as bearing on the form of the evidence, and that none of the committee reports require reliance on profit and loss statements *per se,* but rather show concern with the overall adequacy and reliability of the evidence, amending § 8(b) to "provide a spur to insure that the industry committees will be in a position to act rationally rather than arbitrarily." [25]

Harsh consequences would flow from a contrary reading. As the *Sindicato I* opinion specifically found, profit and loss statements are simply not obtainable from most farmers in Puerto Rico. [26] The greater number of Puerto Rican

farmers are simply too uneducated, their enterprises too marginal, their accounting practices too rudimentary to expect detailed financial statements from them. [27] Congress did not indicate any intention to abandon its general approach of gradualism in achieving minimum wage parity between Puerto Rico and the States, or to penalize Puerto Rican farmers and their employees [28] because of the state of education and accounting practice on the island. [29] "The word 'including' does not lend itself to such destructive significance." *Phelps Dodge Corp. v. Labor Board,* 313 U.S. 177, 189, 61 S.Ct. 845, 850, 85 L.Ed. 1271 (1941).

## IV. SUBSTANTIAL DOCUMENTARY EVIDENCE

██ To avoid misunderstanding, we think it right to emphasize that our ruling is limited to a rejection of the particular objection raised, and is not to be

24. H.Rep.No.93–232, *supra* note 23, at 25–26.

25. *Id.* at 26. The House Report on which petitioners exclusively rely at no point states that profit and loss statements must be supplied, as a *sine qua non* for recommendations of rates below the mainland minimum. In fact, in identifying the evil which *Sindicato I* exposed and the new legislation would correct, the report talks merely in terms of "documentary evidence," without even mentioning profit and loss statements. *Id.* To the same effect is the House Report accompanying H.R. 12435, the bill that was ultimately enacted. Without referring to *Sindicato I* or to profit and loss statements, the report states that "[t]he bill also provides that special industry committees shall recommend the otherwise applicable rate under section 6(a) or 6(b) except where substantial documentary evidence, *including pertinent financial information,* demonstrates an inability to pay such rate." H.Rep.No.93–913, *supra* note 23, at 25–26, U.S.Code Cong. & Admin.News 1974, p. 2835 (emphasis supplied).

26. 145 U.S.App.D.C. at 243, 448 F.2d at 1166.

27. Testimony by the Puerto Rico Farm Bureau before Committee No. 122 referred to studies by the Department of Agriculture of Puerto Rico which showed that "[a]bout two-thirds of our farmers have gone to school for less than six years." App. A150.

28. Immediate parity with the mainland would not be an unmixed blessing for the Puerto Rican farm worker if the island's agriculture industry in the main could not afford to pay the

mainland rate without substantially curtailing employment. Employment in the industry had dropped from 214,000 in 1950 to 60,000 in 1972, notwithstanding the Commonwealth Government's wage subsidies, App. A16. The unemployment rate in fiscal year 1972–73 was 14%, App. A22. The avoidance of widespread agricultural unemployment in Puerto Rico is the very reason for the gradualist approach of the Act, in the hope that employers would thus be able to make "long-range plans for adjusting to the scheduled wage changes," H.Rep.No.93–913, *supra* note 23, at 26, U.S. Code Cong. & Admin.News 1974, p. 2836, as well as for the Island Government's extensive wage subsidy program.

29. Congress was made aware of the state of education among Puerto Rican farmers during the course of hearings held in Puerto Rico in January, 1974. David M. Helfeld, Dean and Professor of Law at the University of Puerto Rico, testified that the farmers subject to the Act "are not able to produce unabridged profit and loss statements," and that this court in *Sindicato I* agreed that "it was unreasonable to expect these farmers to have that kind of data." Hearings Before the General Subcommittee on Labor of the House Committee on Education and Labor, Oversight Hearings on Application of the Fair Labor Standards Act in Puerto Rico, 93d Cong., 2d Sess. at 20–21 (January 17–18, 1974); Brief for Respondents at 31.

taken as an approval for the future of the kind of evidence and findings in this record.

The Committee essentially relied upon three sources of data. The most often cited was an April, 1974 study by the Wage and Hour Division of the Department of Labor. The Division's survey was based on the selection of farms that had been made for an earlier industry committee in 1971 and covered what it believed to be a representative sample of the universe farms subject to the Act.[30] While the Division sought financial information from each of the farms surveyed in 1971, many of the farms had gone out of business or were otherwise unable to be contacted, had been leased to the Commonwealth Government, or had become exempt from the Act.[31] Data for fiscal years 1972 and 1973, received from 30% of the non-sugar cane farms surveyed and 60% of the sugar cane farms surveyed,[32] indicated either losses or slim profit margins which would not yield any net profits once salaries were imputed for work done by the

farm owners and their immediate families.[33]

A second source was the testimony of Mr. Hector Rosa-Rosa, Director of the Guaranteed Income Program of the Commonwealth Government. He testified to the Commonwealth's extensive wage supplement program, initially instituted to guarantee wages higher than the minimum set by the Act for Puerto Rico, but then expanded to absorb industry committee recommendations above the Commonwealth guaranteed rates.[34] He testified, further, to the continuing need for these wage supplement payments—reflecting an inability of the agriculture industry to absorb increases in wage costs.[35]

A third source was the testimony of officials of the Puerto Rico Farm Bureau, an organization representing about 69% of the universe of farms subject to the Act. Referring to updated studies by the Department of Agriculture of Puerto Rico (1972 sugar cane survey) and the Agricultural Experiment Station

**30.** App. A79, A81. The Division estimated that its survey accounted for about 25% of the farms in the industry believed subject to the Act. App. A80.

**31.** Of 212 non-sugar cane farms surveyed in 1971, 54 could not be contacted, 19 had discontinued farming operations, and 4 had become exempt from the Act. App. A80. Of 273 sugar cane farms in the 1971 survey, 33 could not be contacted, 67 had gone out of business or discontinued sugar cane farming, 60 had been leased to the Commonwealth Government, and 7 were otherwise exempt from the Act. App. A81.

**32.** App. A17–18, A79–82.

**33.** In its findings of facts, the Committee referred to the Wage and Hour Division survey to the effect that for fiscal year 1973, 33 of the 75 dairy farms surveyed submitted financial information indicating a consolidated operating profit of 5.8%; 8 of the 34 coffee farms surveyed submitted data indicating a consolidated operating profit of 6.4%; and 62 of the 109 sugar cane farms surveyed supplied data showing a net income of 11.7% of total income. App. A18. These figures were not adjusted to reflect salaries of the owner or unpaid family work. App. A30.

**34.** Under Puerto Rico's wage supplement program which applies to all farmers, whether or not they are subject to the Act, the farmer advances the total guaranteed wage from his

own pocket and is then reimbursed by the amount of the wage supplement and 4% interest. App. A129–30, A135. The farmer is also reimbursed for his social security, unemployment and workmen's compensation contributions. This program was first established in 1969 by Acts Nos. 141 and 142, which required the Commonwealth Government to subsidize the difference between the rates set by the industry committees and the higher rates guaranteed by the Government. Subsequently, in 1972, when the industry committees established rates in excess of those guaranteed by Puerto Rico, the Commonwealth enacted a new law, Act No. 20, and amended Act No. 141, whereby the Government agreed to absorb the additional wage increments.

The Commonwealth Government's share of the farmers' wage bill in April, 1974 was 54 cents for milkers and 39 cents for other workers on dairy farms; 47 cents for workers on coffee, pineapple and the residual category of "other farms"; 43 cents for workers on livestock farms; and 41 cents for workers on tobacco farms. App. A122.

**35.** App. A128–29. In fact, at the time of the hearing, the Commonwealth Legislature had passed a bill which would, among other things, absorb the automatic 12-cent increase mandated by the 1974 Amendments. App. A32, A168–69.

of the University of Puerto Rico (1969 survey of dairy farms), as well as to Commonwealth Government wage subsidy policies (with respect to coffee farms), the Farm Bureau officials testified to dwindling numbers of farms, declining production and employment figures, and nonexistent profit margins.[36] Mr. Luis R. Berrios, president of the Farm Bureau, also submitted the only profit and loss data in the record, an individual statement for his substantial dairy enterprise. Notwithstanding the fact that he operated one of the more successful dairies on the island, he testified that his operating profit in 1972 was only $49,209, a figure which did not include any adjustment for taxes or salary for himself and his family.[37]

The bleak picture painted by the various surveys and testimony—of declining production and rising unemployment, slim profit margins, and extensive wage subsidies—amply supports a determination of inability to pay the mainland rates for farm workers generally. But there are problems with the proof and the report that may present legal deficiencies unless addressed by the Department of Labor and future committees.

First, the Committee failed to deal with the significance of the Commonwealth's income supplement program for the threshold inability to pay determina-

tion. Is it the Committee's approach that the very existence of the subsidies indicates an inability to pay, at least at existing employment levels? Or that the Commonwealth's policy makes inability to pay irrelevant? All the Committee did was refer to the existence of the subsidy program and comment that if the increases resulting from its recommendations "will not be absorbed by the Commonwealth Government, it must be borne in mind that these would be the first increases absorbed by the farmers as employers in more than four (4) years."[38] Does this betoken an approach that past subsidies could properly be included in the gross income available to farmers to meet their payrolls, but that further subsidies could not be presumed? The problem is a difficult one, and future committees may require assistance from the Department of Labor, but administrative law is not generally hospitable to an ostrich approach.

There is a further problem in that the surveys relied upon by the Committee were not explicitly identified as representative of the industry or a predominant part thereof. The surveys cover a substantial portion but less than a predominant part of the industry. In the circumstances of this case, given the fact the Committee was taking action so soon after the new amendments,[39] the exhib-

---

**36.** App. A22–25. The Farm Bureau officials testified that from 1962–63 to 1972–73 total agricultural employment declined by 62.7%, with the unemployment figure for 1972–73 at about 14%. For sugar cane farming, employment dropped by 77.6% for this period, and from 1968–69 to 1972–73 the number of sugar cane farms dropped from 6,531 to 2,954, with a 39% decrease in production; the Farm Bureau's projection for 1972–73 from the 1972 Puerto Rico Department of Agriculture's sugar cane survey indicated an estimated total income of $37.7 million with an estimated loss of $1.8 million. For dairy farming, the Farm Bureau's update of the 1969 University of Puerto Rico's Agricultural Experiment Station survey indicated an estimated total income of $117,-462 with an estimated loss of $6,040 per farm in 1973, after an allowance of $6,448 for the owner's salary and family labor. Coffee and tobacco production, according to the Farm Bureau, also showed a precipitous decline in the number of farms and extent of production from 1962–63 to 1972–73, despite wage sup-

plementation by the Commonwealth Government.

**37.** According to Mr. Berrios' statement for 1973 the total revenues for his farm were $416,323 with net earnings of $62,843 or 15%; for 1972 the total revenues were $421,565 with income of $49,209. App. A21. The 1973 increase in net operating profit was due to cutbacks in feed and number of employees. App. A21, A144–45.

**38.** App. A32.

**39.** Under § 6(c)(1), 29 U.S.C. § 206(c)(1), the mainland rates are "superseded in the case of any employee in Puerto Rico . . . only for so long as and insofar as such employee is covered by a wage order heretofore or hereafter issued by the Secretary pursuant to the recommendations of a special industry committee . . . ."

Here, the 1972 wage orders presumably were to expire two years after their effective dates—February 28, 1974 for the majority of workers in agriculture, and August 11, 1974

its and assumption of the Committee may be taken as resting on the premise that the surveys were fairly representative of the industry (or perhaps as even reflecting more ability to pay than the industry as a whole—in the thought that Mr. Berrios and the farmers responding to the Wage and Hour Division survey were more organized, and probably more successful, than those incapable of producing any financial information).

In future years, this matter should be addressed explicitly—by the committees, and by survey officials of the Department of Labor. There would be time to obtain documentary material as to those farms that are substantial business enterprises, not to be confused with those owned by the marginal and less educated farmers. If profit and loss data, or documentation of similar probative value, cannot be secured for a predominant part of the industry, an alternative may lie in a reasoned submission that the surveys and materials proffered are fairly representative of a predominant portion of the industry. An allowance for lack of conventional mainland accounting data would not necessarily excuse failure to produce reliable, representative documentary evidence which timely and adequate preparation, by the Department of Labor or other sources, can realistically yield.

Furthermore, much of the Commission's proof is in the form of a recitation of the survey results as to net operating income figures. There is no meaningful address to the issue of the impact of going to the mainland minimum. The court cannot itself reconstruct the exhibits annexed, e.g., adjustments for salary imputed to the owner. The intention of the 1974 amendments is to require the report itself to relate in a logical fashion how the data supports the particular recommendations made. Hopefully, future

committees will be aided by the Department of Labor so that their recommendations can be presented as the product of reasoned decisionmaking, susceptible to the judicial review provided by Congress.

## V. CONCLUSION

In sum, we affirm the minimum wage order for the agriculture industry in Puerto Rico, issued August 23, 1974, in rejecting the only contention properly raised before Industry Committee No. 122: the 1974 Amendments to the Act do not require individual profit and loss statements as the exclusive mode of rebutting the statutory presumption in favor of the mainland minimum, but permit rebuttal by "substantial documentary evidence" bearing similar indicia of reliability. No objection was presented before the Committee to the absence of formal findings on inability to pay or the substantiality of the record evidence, and we accordingly have no authority under § 10(a) to disturb the minimum wage order on these grounds. We contemplate that the Department of Labor will take a more active role in aiding industry committee deliberations so that future reports and recommendations will more clearly evidence reasoned decisionmaking.

*Affirmed.*

WILKEY, Circuit Judge (concurring):

In accordance with section 10(a) of the Fair Labor Standards Act, no objection to the Secretary of Labor's wage order "shall be considered by [this] court unless such objection shall have been urged before [the] industry committee or unless there were reasonable grounds for failure so to do."[1] As Judge Leventhal recognizes in his conclusion, "No objection was presented before the Committee to the absence of formal findings on inabili-

---

for the category of "other workers" on coffee and tobacco farms. *See* note 3, *supra.* Committee No. 122 was convened on February 12, 1974, prior to the enactment of the 1974 Amendments, which became effective on May 1, 1974. By the time the Committee held its deliberations, during the last week of June, 1974, the greater number of agricultural workers had been laboring without a wage order

for four months, and the wage order covering the remaining workers would be up for renewal in a month and a half. In the circumstances, we believe that the Committee's decision to act in June, 1974, on information fairly in hand at that time, was not unreasonable.

1. 29 U.S.C. § 210(a) (1970).

ty to pay or the substantiality of the record evidence, and we accordingly have no authority under § 10(a) to disturb the minimum wage order on these grounds." [2] Since we have no authority to disturb the order on these grounds, I find it unnecessary for this court to decide whether "there was . . . infirmity in the nature of the evidence relied upon" [3] or to approve or not approve "for the future . . . the kind of evidence and findings in this record." [4] I appreciate Judge Leventhal's desire to offer guidance for future committee determinations, but I read section 10(a) as precluding consideration of those objections which have not been timely asserted before an industry committee.

Accordingly, I concur in the result reached by the court and in the following portions of the opinion: sections I, II (except the discussion of an implicit but not formal finding, such being unnecessary because of our ruling on section 10(a)), III, and V.

---

**2.** Court's opinion at 1033. Additionally, Judge Leventhal discerns no reasonable grounds for petitioners' failure to raise their objections before the industry committee below. *Id.* at 1027.

